**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | |
| **v.** | **)** | **Case No.: 3:25-CR-00069-MEO-DCK** |
| | **)** | |
| **DANIEL JOSEPH BROADWAY** | **)** | |
| | **)** | |

## <u>UNITED STATES' SENTENCING MEMORANDUM</u>

The United States of America, by and through Russ Ferguson, United States Attorney for the Western District of North Carolina, having considered the facts and circumstances of this case, and the sentencing factors set forth in 18 U.S.C. § 3553(a), respectfully recommends that the Court order **DANIEL JOSEPH BROADWAY**:

| | |
|---|---|
| Imprisonment: | 78 months |
| Supervised release: | Life |
| Special Assessment: | $17,000 |
| Restitution: | $15,000 |
| Fine: | $0 |

In support of this recommendation, the government submits this sentencing memorandum.

## PROCEDURAL HISTORY

In April 2023, the National Center for Missing and Exploited Children received a cybertip from Google, indicating that the Google Drive account linked to Broadway had uploaded images constituting child sexual abuse material ("CSAM"). *See* PSR ¶ 16. Following law enforcement investigation, on December 12, 2023, the Charlotte Mecklenburg Police Department ("CMPD") went to Broadway's house to conduct a knock and talk for further investigation. PSR ¶ 19. The encounter prompted law enforcement to obtain a search warrant for Broadway's residence, which revealed 9 electronic devices that contained CSAM, including CSAM generated by artificial-

1

intelligence ("AI"). PSR ¶ 22. In total, which includes the content in the Gmail account and the 9 electronic devices seized from Broadway's residence, Broadway was in possession of 8,661 images (3,529 unique) and 2 videos (1 unique) of Non-AI CSAM. Additionally, he was in possession of 30,292 images (28,045 unique) and 32 videos (10 unique) of AI CSAM. PSR ¶ 23.

On March 27, 2025, the government filed a Bill of Information and plea agreement wherein Broadway agreed to plead guilty to one count of possession and access with intent to view child pornography involving a prepubescent minor, in violation of 18 U.S.C. § 2252A(a)(5)(B), and one count of possession of obscene visual representations of the sexual abuse of children, in violation of 18 U.S.C. § 1466A(b)(1). ECF Nos. 1, 2. On April 23, 2025, Broadway made his initial appearance, pleaded guilty, and was remanded to custody, where he has remained.

Broadway's sentencing hearing is currently set for January 27, 2026.

## LEGAL STANDARD

In sentencing a defendant, district courts must follow a four-step process: (1) properly calculate the advisory sentencing guideline range; (2) determine whether a sentence within that range and within statutory limits serves the factors set forth in 18 U.S.C. § 3553(a) and, if it does not, select a sentence that does serve those factors; (3) implement mandatory statutory limitations; and (4) articulate on the record the reasons for selecting a particular sentence and, if applicable, explain why a sentence outside of the advisory sentencing guideline range better serves the relevant sentencing purposes set forth in 18 U.S.C. § 3553(a). *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006); *see also United States v. Booker*, 543 U.S. 220, 260-65 (2005); 18 U.S.C. § 3553(a).

**APPLICABLE GUIDELINE RANGE**

The PSR correctly calculates the base offense level for Counts one and two as starting at 18 pursuant to USSG § 2G2.2(a)(1). PSR ¶ 37. Thereafter, the PSR correctly applies the enhancements involving a minor who had not attained the age of 12, PSR ¶ 38, use of a computer, more than 600 images. PSR ¶¶ 38, 40, 41.

The PSR also correctly applies the enhancement in section 2G2.2(b)(4). PSR ¶ 39. This enhancement applies when the material involved depicts either "sadistic or masochistic conduct or other depictions of violence," (2G2.2(b)(4)(A)) or "sexual abuse or exploitation of an infant or toddler" (2G2.2(b)(4)(B)). Further, the enhancement applies "regardless of whether the defendant specifically intended to possess, access with intent to view, receive, or distribute such materials." USSG 2G2.2, cmt 3. While the PSR does not describe any of the images that triggered this enhancement, the forensic analysis revealed 21 (9 unique) images that were categorized as sadomasochist, as documented in the forensic report produced in discovery at USA_00000034. For example, one image depicts a prepubescent minor, approximately 10-12 years old, naked and tied up on the floor displaying her vagina in a lascivious manner. The Plea Agreement further memorializes the parties' agreement that this enhancement applies, although it cited subsection (b)(4)(B) instead of (b)(4)(A). ECF No. 2 at 2. The Plea Agreement also incorrectly cites subsection (b)(4)(B), which applies to infants and toddlers. The correct subsection is 2G2.2(b)(4)(A), involving sadistic or masochistic conduct or other depictions of violence. *See United States v. Overby*, 838 F. App'x 966, 969 (6th Cir. 2021) ("images depicting bondage ... even if engaged in by consenting adults experiencing no pain at all, would be objectively perceived as portraying a sadistic act."). The forensic analysis did not reveal any material depicting infants or toddlers. This distinction, however, does not change the guideline calculation.

Accordingly, Broadway's total offense level is 31. PSR ¶ 45. Accounting for acceptance of responsibility (-3), Broadway's adjusted offense level is correctly calculated at 29. PSR ¶ 47-49. Broadway does not have a criminal history and has a criminal history category of I. Based on his total offense level and criminal history, the PSR correctly calculates Broadway's guideline range as 78-97 months. PSR ¶ 73.

These calculations are consistent with the parties' plea agreement. ECF No. 2 at 2.

## STATUTORY LIMITATIONS

Broadway's conviction on Counts one and two carry a statutory minimum term of 10 years imprisonment and a maximum term of twenty years per count. *Id.* ¶ 37. Accordingly, Mr. Pennington's statutory maximum term of imprisonment is 40 years.

## APPLICATION OF 18 USC § 3553(a) FACTORS

### 1. Nature and circumstances of the offense

The nature and circumstances of the offense are a significant aggravating factor, which weighs in favor of a 78-month guideline sentence.

The nature and circumstances of the offense are among the worst type of offenses to commit, involving the sexual exploitation of children. As described in the Factual Basis (ECF No. 3) and Statement of Relevant Conduct in the PSR, Broadway collected genuine CSAM and produced his own using generative AI. In total, he was in possession of a significant amount of material, including 8,661 images (3,529 unique) and 2 videos (1 unique) of Non-AI CSAM, and 30,292 images (28,045 unique) and 32 videos (10 unique) of AI CSAM.

Broadway stored his CSAM on 9 devices, plus his Google account. This is important because each time offenders like Broadway transport, distribute, receive, or simply duplicate CSAM on their own devices, there is another copy that memorializes the sexual abuse of children.

And each time these pornographic images are viewed, the child is revictimized. The impact Broadway's conduct has is further memorialized in the victim impact statements submitted by victims and their family members.

Moreover, Broadway used a peer-to-peer file sharing program, called BitTorrent, to develop his collection.[1] BitTorrent is a peer-to-peer file sharing program that allows for its users to distribute electronic files in a decentralized manner. Typically, to download content, the user needs to make their own files available for others to download, which involves distribution to others. The forensic examination revealed that Broadway received CSAM using BitTorrent. For example, one image depicts a nude prepubescent female lying on a red rug. The female's leg is up and straightened, exposing her vagina. A watermark was noted in the upper left portion of the picture that reads "LS MODELS.com." This is a well-known CSAM series.

Courts have commented on, and Congress has recognized, these perpetual harms inflicted on these victims by people like Broadway. "The demand for child pornography harms children in part because it drives production, which involves child abuse. The harms caused by child pornography, however, are still more extensive because child pornography is 'a permanent record' of the depicted child's abuse, and 'the harm to the child is exacerbated by its circulation.'" *Paroline v. United States*, 572 U.S. 434, at 439–40 (2014) (quoting *New York v. Ferber*, 458 U.S. 747, 759 (1982)); *see United States v. Burgess*, 684 F.3d 445, 459 (4th Cir. 2012) ("It is well established that children featured in child pornography are harmed by the continuing dissemination and possession of that pornography."). The harm suffered by victims of child pornography offenses is well supported by medical and social science. *See Ferber*, 458 U.S. at 759–60 & nn. 9–10

---

[1]    Although not described in the PSR, this fact is described in the forensic report at USA_00000008 ("There were several software programs installed on this device including the BitTorrent program. BitTorrent, is a peer to peer file sharing program that allows for its users to distribute electronic files in a decentralized manner.").

(collecting authority). "[E]very viewing of child pornography is a repetition of the victim's abuse," and "[h]arms of this sort are a major reason why child pornography is outlawed." *See Paroline v.* 572 U.S. at 457; *United States v. Skinner*, 536 F. Supp. 3d 23, 39 (E.D. Va. 2021), *aff'd,* 70 F.4th 219 (4th Cir. 2023) ("[I]n 2008, Congress . . . observ[ed] that '[c]hild pornography is a permanent record of a child's abuse and the distribution of child pornography images revictimizes the child each time the image is viewed.'").

The AI generated CSAM is no less offensive than the real CSAM, even though a real child is not depicted. While no "real" child may be physically used during its creation, the material is inherently harmful and contributes to a broader ecosystem of child sexual exploitation. Consumption of AI CSAM can normalize the sexualization of children and desensitize offenders, leading them to lower their inhibitions against real-world sexual abuse. Moreover, AI CSAM will always have the effect of fueling demand for the "real thing," putting real children at risk and creating more market demand for exploitation.

AI can also be used to manipulate existing, non-sexual images of real children. Indeed, though not described in the PSR, Broadway used AI to modify images of real people.[2] One of the devices contained naked pictures of at least two celebrities, depicted as adults, which were nudified using AI. The potential danger to the community using AI to modify pictures of real people, including minors, is severe and can cause profound and lasting psychological and emotional trauma, including shame, humiliation, and a sense of ongoing violation.

Accordingly, the nature and circumstances of the offense are significantly aggravating in this case and weigh in favor of a guideline sentence.

---

[2]     The forensics describing these facts were described in a forensic report produced in discovery at USA_00000022.

### 2. History and characteristics of the defendant

Broadway's history and characteristics are mostly aggravating. Broadway presents as a smart individual with family support, a great job, financially successful, and no apparent criminal life or history of sexual abuse. Broadway, however, had a second life that focused on the sexual exploitation of minors for his sexual pleasure. Instead of using his intelligence and education for good, Broadway used his skills to create deplorable images of minors using AI, including designing an image of a 7-year-old pregnant girl exposing her vagina. While Broadway appears remorseful, his acceptance of responsibility has already been accounted for in the guidelines calculation and the deal he struck with the government, which reduced his offense level by 4 points.

Accordingly, there being no weighty mitigation in Broadway's history or characteristics, this factor weighs in favor of a guideline sentence.

### 3. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

The seriousness of Broadway's conduct cannot be overstated. *See, e.g.*, *United States v. Pugh*, 515 F.3d 1179, 1202 (11th Cir. 2008) ("[W]e have typically treated child sex offenses as serious crimes, upholding severe sentences in these cases"); *United States v. Guerra*, 535 F. App'x 214 (4th Cir. 2013) (*per curiam*) (affirming 120-month sentence—the statutory maximum—for possession of child pornography).

Accordingly, this factor is significantly aggravating and weighs in favor of a guideline sentence.

### 4. The Need to Afford Adequate Deterrence to Criminal Conduct

Deterrence is a very important consideration in considering an appropriate sentence. *See, e.g.*, *Osborne v. Ohio*, 495 U.S. 103, 109-10 (1990) ("It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess

and view the product, thereby decreasing demand."); *Ferber*, 458 U.S. at 760 ("The most expeditious if not the only practical method of law enforcement may be to dry up the market for [CSAM] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product."); *United States v. Goff*, 501 F.3d 250, 261 (3d Cir. 2007) ("[D]eterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing . . . ."); *United States v. Barevich*, 445 F.3d 956, 959 (7th Cir. 2006) ("Transporting and receiving child pornography increases market demand. The greater concern under the Guidelines is for the welfare of these exploited children. The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it.").

Despite the fact that Broadway and others who have an overwhelming sexual interest for young children may not be easily deterred, it is also true that others would certainly not be deterred if Broadway receives a low sentence. Offenders do talk to each other via the Internet and are concerned about law enforcement—even encrypting their hard drives to prevent detection.

Broadway's sentence will send a message one way or another to those individuals who share Broadway's sexual gratification in watching the rape, molestation, and sexual exploitation of children, especially those who use AI to generate this content. A sentence below the guideline would not achieve the deterrence necessary for those like Broadway who may consider engaging in this activity.

Deterrence is particularly important in this case because of Broadway's use of AI to generate CSAM. As AI continues to grow in the community, people like Broadway seek to use the power of AI to harm others, either by using AI to modify, or morph, depictions of real children or using AI to generate original depictions of the sexual abuse of children to fuel their sexual interest.

In any case, the message should be clear that perpetrators will receive significant sentences consistent with the guidelines.

**5. A guideline sentence would best protect the public from further crimes of the defendant.**

In June 2021, the Sentencing Commission issued a report on federal sentencing of child pornography in non-production offenses. *See* United States Sentencing Commission, Federal Sentencing of Child Pornography: Non-Production Offenses, June 2021. The study reported a recidivism rate of 27.6% for federal offenders in non-production child pornography crimes, but it went on to explicitly caution that this figure should be viewed as a conservative measurement of actual recidivism because the study's data was based on reported recidivism, not the "dark figure" of crime that goes unreported. *See Id* at 69. The report further referenced studies estimating that only 1 in 20 cases of child sexual abuse is reported or identified. *See id.* at 69, n.136 (*citing* Nicholas Scurich & Richard S. John, *The Dark Figure of Sexual Recidivism*, 37 Behav. Sci. & The Law 158 (2019); Ryan C. W. Hall & Richard C. W. Hall, *A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues*, 82 Mayo Clinic Proc. 457, 460–61 (2007)).

Congress has repeatedly recognized that recidivism rates are particularly high for sex offenders. *See* Krista L. Blaisdell, Note, *Protecting the Playgrounds of the Twenty-First Century: Analyzing Computer and Internet Restrictions for Internet Sex Offenders*, 43 Val. U. L. Rev. 1155, 1192, n.150 (2009) (compiling Congressional statements regarding the high risk of recidivism among child sex offenders). Courts have repeatedly recognized this as well. *See United States v. Pugh*, 515 F.3d 1179, 1201 (11th Cir. 2008) ("child sex offenders have appalling rates of recidivism and their crimes are under-reported"); *United States v. Allison*, 447 F.3d 402,

405-406 (5th Cir. 2006) ("Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders.").

A sentence within Broadway's guideline range, followed by lifetime supervised release, is appropriate to monitor his activities on the internet. Such a sentence will also ensure compliance with sex offender registration requirements, provide any additional services Broadway needs to become a productive member of society, and maintain disincentives against possible future criminal activity.

### 6. A Guideline Sentence Would Not Result in an Unwarranted Sentencing Disparity

The facts of this case are unique because of Broadway's use of AI to generate his own CSAM. Accordingly, a comparison to other cases would not be helpful. Each case is decided upon its unique facts and circumstances, and each defendant is sentenced based on their own individualized history and characteristics. Drawing conclusions from cases decided by other district courts based on other facts unrelated to the instant matter does nothing to vindicate the interests of 18 U.S.C. § 3553(a) and serves only to deflect from Broadway's own pernicious conduct.

In *United States v, Miller*, 665 F.3d 114 (5th Cir. 2011), the defendant argued that statistics showed that many other defendants sentenced pursuant to section 2G2.2 had received below guideline sentences. Rejecting this argument, the Fifth Circuit explained:

> . . . appellate courts are not tasked with applying statistical analyses to assess the reasonableness of a particular sentence in a particular case. Nor are district courts. While sentences imposed by other courts may be a consideration for a district court, such information does not set a median, floor or ceiling.

*Id.* at 122.

In *United States v. Campbell*, 606 Fed. Appx. 818 (6th Cir. 2015), the court considered the argument of a defendant in a child-pornography case who had received a 30-year sentence.

Campbell argued that the district court procedurally erred by creating an unwarranted sentencing disparity since another defendant, who had been convicted of the same offense, had received a 16-year sentence. The Sixth Circuit characterized this argument as the defendant's "weakest" and observed:

> It is the essence of discretion that it may properly be exercised in different ways and likewise appear differently to different eyes. Discretion, put differently, necessarily means that different courts will sentence different defendants to different sentences, even for similar conduct. A correct calculation of the guidelines solves this disparity.

*Id.* at 821 (internal citations omitted).

Importantly, Broadway's offense conduct shows that he transported CSAM to his Google account, which is a violation of 18 U.S.C. § 2252A(a)(1), and he received CSAM using BitTorrent, which is a violation of 18 U.S.C. § 2252A(a)(2)(A). Given his use of BitTorrent, he probably distributed as well because this file sharing program requires users to make their own files available for others to download. Each of these offenses (transportation, receipt, distribution) carries a mandatory minimum term of imprisonment of 5 years. 18 U.S.C. § 2252A(b)(1). They also have a base offense level of 22, which is 4 points higher than where Broadway started. While the government is not suggesting that Broadway be sentenced as a transporter, receiver, or distributor, the government makes this point to show that a comparison to other cases is impractical because a true comparison would have to account for facts beyond the offense of conviction and the sentence. Additionally, this point is important because Broadway has already received a significant benefit from his plea negotiations with the government.

The Fourth Circuit has held that "a sentence imposed 'within the properly calculated Guidelines range . . . is presumptively reasonable.'" *United States v. Strieper*, 666 F.3d 288, 295 (4th Cir. 2012). We ask this Court to impose one here.

**NO VARIANCE**

Broadway agreed to the guidelines calculation and has not objected to their calculation. At the sentencing hearing, the government anticipates that he will ask this Court for a downward variance. His request would be permissible pursuant to the plea agreement. In anticipation of that request, the government takes this opportunity to respond to an often-cited basis for a downward variance. A basis that this Court should.

Defendants often ask for a downward variance or outright rejection of the USSG § 2G2.2 guidelines based on policy disagreement because, as the argument goes, the guidelines are flawed and lack empirical support. According to the argument, USSG § 2G2.2 is flawed because it is "not the product of empirical study by the Sentencing Commission." As noted below, some courts have been persuaded by that argument. The Fourth Circuit, however, has rejected it.

Since 2010, the Fourth Circuit has instructed courts "to give respectful attention to Congress' view that [child pornography crimes] are serious offenses deserving serious sanctions." *United States v. Morace*, 594 F.3d 340, 347 (4th Cir. 2010). This instruction came in light of the increasing trend of downward departures and below-guideline variances documented by the Sentencing Commission in 2009. *Id.* at 346 (citing U.S.S.C., *The History of the Child Pornography Guidelines,* 8 (Oct.2009). The Fourth Circuit noted that, "[w]hile recognizing this trend, the Commission has also acknowledged the increasing emphasis that Congress has given to child pornography cases." *Id.* Congress's emphasis reflects their intent that the guidelines and penalties for child pornography offenses should be severe:

> For more than 30 years, and particularly in recent years, Congress has focused attention on the scope of child pornography offenses and the severity of penalties for child pornography offenders. Through creating new offenses, enacting new mandatory minimums, increasing statutory maximums, and providing directives to the Commission, Congress has repeatedly expressed its will regarding appropriate penalties for child pornography offenders.

*Id.* at 347 (quoting *History of the Child Pornography Guidelines,* at 6).

In drafting the current guidelines in USSG § 2G2.2, the Commission noted that, "[w]hen Congress establishes a mandatory minimum penalty, the Commission generally has four approaches available for selecting the appropriate base offense level." *History of the Child Pornography Guidelines,* at 44. In the third option, which they selected, "the Commission may set the base offense level below the mandatory minimum and rely on specific offense characteristics and Chapter Three adjustments to reach the statutory mandatory minimum." *Id.* at 45. By choosing a base offense level that is lower than the mandatory minimum term of imprisonment for distributors, receivers, and transporters, the Commission baked-in many of the enhancements. In other words, these enhancements are often applicable because the base offense level was consciously and artificially set at a level below the statutory minimum. *Id.* at 46 ("The Commission's analysis revealed that a majority of offenders sentenced under §2G2.2 were subject to specific offense characteristics that increased their offense level. Specifically, the overwhelming majority of these offenders received a 2-level enhancement for use of a computer (89.4%) and a 2-level enhancement for material involving a child under 12 (91.4%)."); *see United States v. Walters*, 775 F.3d 778, 786 (6th Cir. 2015) ("The Commission purposefully set both the base offense level and the degree of enhancement with the frequency of computer use in mind[, and w]e have adopted that rationale and rejected arguments that the computer enhancement should not be used simply because it is applied frequently."). Not applying enhancements that are clearly applicable simply grants the defendant an unintended windfall.

The Commission did, in fact, analyze data in coming to this conclusion, explaining that, "[a]fter engaging in extensive analysis of its data, including a review of typical trafficking and receipt offenders, offense characteristics, and rates of below guideline sentences for these offenses,

the Commission adopted the third, most lenient option of those typically used by the Commission, and selected base offense level 18 for possession offenders and base offense level 22 for trafficking and distribution offenders." *History of the Child Pornography Guidelines,* at 46. Additionally, Congress's directives are informed by its own empirical analysis. *See United States v. Bistline*, 665 F.3d 758, 764 (6th Cir. 2014) ("Congress's long and repeated involvement in raising the offense levels in § 2G2.2 makes clear that the grounds of its action were not only empirical, but retributive—that they included not only deterrence, but punishment." (*See generally* United States Sentencing Commission, *The History of the Child Pornography Guidelines* (Oct.2009); *id.* at 54 ("Congress has demonstrated its continued interest in deterring and punishing child pornography offenses [.]"); PROTECT Act, Pub.L. No. 108–21, § 513(c) (2003) (directing the Commission "to ensure that the guidelines are adequate to deter and punish" child-pornography offenses); *United States v. Morace,* 594 F.3d 340, 347 (4th Cir.2010) (noting "Congress'[s] view that child pornography crimes are serious offenses deserving serious sanctions") (internal punctuation omitted)).

In drafting the guidelines at issue, the Commission also conferred with the defense bar. *History of the Child Pornography Guidelines,* at 46 ("This analysis was supplemented by public comment from the DOJ and the Federal Defenders. Both the DOJ and the Federal Defenders made recommendations to the Commission during the 2004 amendment cycle regarding proposed base offense levels for these crimes."). It is ironic that now the defense bar complains about enhancements being applicable when "[t]he Federal Defenders concurred with the Commission's assessment that setting the base offense level lower than the mandatory minimum would be appropriate given the likelihood that certain enhancements would frequently apply." *Id.* at 46-47.

In 2012, relying on this backdrop, in a case where the defendant was sentenced pursuant to USSG § 2G2.2, the Fourth Circuit rejected the argument that "a presumption of reasonableness should not apply to sentences for child pornography offenses because the relevant Guideline was developed pursuant to congressional dictates rather than the Sentencing Commission's expertise." *United States v. Strieper*, 666 F.3d 288, 295–96 (4th Cir. 2012). The Court reiterated, "[w]e have previously rejected this view, however, and instructed courts 'to give respectful attention to Congress'[s] view that [child pornography crimes] are serious offenses deserving serious sanctions.'" *Id.* at 296 (citing *Morace*, 594 F.3d at 296).

In 2015, the Fourth Circuit twice rejected the same arguments and reiterated its directive to respect the guidelines. In *United States v. Kennedy*, 608 Fed. Appx. 169 (4th Cir. 2015), the defendant's objections focused on the "empirical" support for the guidelines, claiming that the "the child pornography Sentencing Guidelines did not result from the Sentencing Commission's typical empirical approach, but instead are the result of Congressional intervention designed to increase penalties applicable to child pornography offenses." 608 Fed. Appx. at 170. Citing its precedent, the Court rejected the argument, explaining that "[t]his argument amounts to a policy attack on the relevant Guidelines, which we have previously rejected." *Id.* (citations omitted); *see also United States v. Slayton*, 629 Fed. Appx 475 (4th Cir. 2015) (rejecting argument that "his sentence was substantively unreasonable because the district court relied too heavily on the 'flawed' child pornography guidelines," claiming that the guidelines "lack any empirical basis and almost always result in a range near the statutory maximum, even for low level offenders") (citations omitted).

The fact that federal defendants for child pornography offenses often trigger many of the sentencing enhancements reflects the fact that the United States Attorney's Office often prosecutes

the worst of the offenders. Additionally, the fact that federal defendants trigger many enhancements reflects the severity of their conduct, not a basis for mitigation. As one court put it:

> The assertion that sentences should be reduced because it is easy to accumulate a large number of pictures quickly also rings hollow. The Court does not dispute that it is very likely that a defendant could acquire more than 600 images with just a few mouse clicks and several emails. But that number of images is not collected by accident. Instead, those images are sought out by a troubled mind, from like-minded individuals. Thus, a defendant makes a cognitive choice to seek out that level of images. Moreover, the Court has never before seen an argument that because a crime is easy to commit, it should be punished less severely. Robbery is certainly simplified from the criminal's perspective by the use of a firearm and the choice of a feeble, elderly victim. The Guidelines, however, do not lessen punishment because the crime was easier to commit. In fact, seeking out a vulnerable victim leads to a 2–level enhancement under the Guidelines. U.S.S.G. § 3A1.1(b)(1). This Court, therefore, will not alter its sentence simply because accessing and growing a database of child pornography has become easier as technology has advanced.

*Id*. at 851-853; *see also United States v. Johnson*, 765 F. Supp. 2d 779, 782 (E.D. Tex. 2010) ("Gratuitous attacks on the Guidelines or Congress by a defendant for 'policy reasons' add nothing to the analysis of a particular case, or to the law in general. Claiming that there is a disparity between the Guidelines sentence for a first-time offender who has visually raped numerous children and one who has possessed illegal drugs ignores congressional intent to 'avoid unwarranted sentence disparities among defendants . . . guilty of similar conduct.'").

Nevertheless, defendants continue to raise the same arguments without citing any controlling precedent. For example, defendants often cite *United States v. Dorvee,* 616 F.3d 174, 184-86 (2d Cir. 2010).

Contrary to Fourth Circuit precedent, the Second Circuit, in *Dorvee*, reiterated some of the same arguments defendants make in the context of USSG § 2G2.2. *See* 616 F.3d at 182-88. While the Second Circuit did discuss USSG § 2G2.2, its primary reason for reversal was because the district court committed procedural error by improperly calculating the guideline. *Dorvee*, 616 F.3d at 181 ("[T]he district court plainly erred in its Guidelines calculation: the Guidelines

sentence was not 262 to 327 months, it was the statutory maximum."). The Second Circuit went on to conduct a gratuitous analysis of USSG § 2G2.2, because "we have found and identify here certain serious flaws in U.S.S.G. § 2G2.2—issues which are squarely presented on *this* appeal and which must be dealt with by the district court at resentencing." *Id*. at 182 (emphasis in original).

Other circuits have rejected *Dorvee*. *See, e.g., United States v. Grigsby*, 749 F.3d 908, 911 (10th Cir. 2014) ("But neither *Dorvee* nor the Commission Report stand for the proposition that *any* application of § 2G2.2 will yield an unreasonable sentence." (emphasis in original)). For example, in *United States v. Miller*, 665 F.3d 114, 120 (5th Cir. 2011), the Fifth Circuit responded to the *Dorvee* argument in the following way:

> With great respect, we do not agree with our sister court's reasoning. Our circuit has not followed the course that the Second Circuit has charted with respect to sentencing Guidelines that are not based on empirical data. Empirically based or not, the Guidelines remain the Guidelines. It is for the Commission to alter or amend them. The Supreme Court made clear in *Kimbrough v. United States*[, 552 U.S. 85, 108 (2007)] that "[a] district judge must include the Guidelines range in the array of factors warranting consideration," even if the Commission did not use an empirical approach in developing sentences for the particular offense. Accordingly, we will not reject a Guidelines provision as "unreasonable" or "irrational" simply because it is not based on empirical data and even if it leads to some disparities in sentencing. The advisory Guidelines sentencing range remains a factor for district courts to consider in arriving upon a sentence.

*United States v. Miller*, 665 F.3d 114, 120–21 (5th Cir. 2011) (internal citations omitted).

Likewise, the Eleventh Circuit rejected the *Dorvee* argument, observing:

> We have previously rejected the argument that U.S.S.G. § 2G2.2 is inherently flawed. *United States v. Wayerski,* 624 F.3d 1342, 1354–55 (11th Cir.2010); *United States v. Pugh,* 515 F.3d 1179, 1201 n. 15 (11th Cir.2008). Scott's reliance on a Second Circuit case criticizing § 2G2.2, *United States v. Dorvee,* 616 F.3d 174 (2d Cir.2010), is therefore misplaced . . . .

*United States v. Scott*, 476 F. App'x 845, 846 (11th Cir. 2012).

Even assuming that defendants are correct that USSG § 2G2.2 is not empirically supported, there is no requirement that guidelines be empirically supported. Even the Second Circuit, despite

*Dovree*, has made this point. After *Dorvee*, the Second Circuit decided *United States v. Swackhammer*, 400 Fed. Appx. 615 (2nd Cir. 2010) (unpublished), where the defendant argued that the guideline sentence was substantively unreasonable because the district court failed to consider that the Sentencing Guidelines do not provide empirical support for the length of sentences in child pornography cases. *Id*. The Circuit Court held that the argument "was prefaced on a significant over-reading of *Dorvee*." *Id*. In fact, the district court was not required to do an empirical analysis review. *Id*.

Similarly, the Third Circuit has explained:

[T]he District Court is not "required to engage in 'independent analysis' of the empirical justifications and deliberative undertakings that led to a particular Guideline." [*United States v. Lopez-Reyes*, 589 F.3d 667, 671 (3d Cir. 2009)] (*citing United States v. Aguilar-Huerta*, 576 F.3d 365, 368 (7th Cir. 2009), and *United States v. Duarte*, 569 F.3d 528, 530 (5th Cir. 2009)). *See also Aguilar-Huerta*, 576 F.3d at 367-68 ("[W]e do not think a judge is required to consider . . . an argument that a guideline is unworthy of application in any case because it was promulgated without adequate deliberation. He should not have to delve into the history of a guideline so that he can satisfy himself that the process that produced it was adequate to produce a good guideline. For if he is required to do that, sentencing hearings will become unmanageable, as the focus shifts from the defendant's conduct to the 'legislative' history of the guidelines." (*citing United States v. Huffstatler*, No. 08-2622, 2009 WL 1855161, at *3 (7th Cir. 2009); *United States v. O'Connor*, 567 F.3d 395, 398 (8th Cir. 2009); and *United States v. Mondragon-Santiago*, 564 F.3d 357, 366-67 (5th Cir. 2009))).

*United States v. Mendez-Ramirez,* 461 F. App'x 127, 129-30 (3d Cir. 2012) (emphasis in original); *see also United States v. Hall*, 632 F.3d 331, 338 (6th Cir. 2011); *United States v. Schmitz*, 717 F.3d 536, 542 (7th Cir.) cert. denied, 134 S. Ct. 451 (2013).

For the reasons explained above, Broadway should not get a variance based on any argument that the guidelines are flawed or lack empirical support.

**RESTITUTION**

At this time, 3 of the victims depicted in the 21 series identified have demanded restitution. The total restitution amount is being discussed among the parties and counsel for the victims. The undersigned anticipates that an agreement will be reached before the sentencing hearing. If so, the government will file a motion for restitution outlining that agreement.

**FINANCIAL PENALTIES**

Pursuant to 18 U.S.C. § 2259A(a)(1), Broadway should be required to pay at least $17,000 towards the special assessment.

Section 2259A(a)(1) requires the court to assess "not more than $17,000" on any person convicted of an offense under section 2252A(a)(5) (Count 1). "In determining the amount of the assessment under subsection (a), the court shall consider the factors set forth in sections 3553(a) and 3572." 18 U.S.C. § 2259A(c).

Additionally, with respect to the fine, his guideline range is $25,000 to $250,000. PSR ¶ 84.

Some of the 3553(a) factors have been discussed above. Additionally, Broadway is not indigent and has a significant net worth, as described in paragraph 69, although he appears to share title in most of that worth with his wife.

To be consistent with its guideline recommendation of 78 months, which is the low end, the government would recommend that Broadway pay a fine of $25,000, which is the low end of the range for a fine. However, given that Broadway is agreeing to pay restitution and, assuming the Court orders him to pay $17,000 in special assessments, the government is not recommending a fine.

**SENTENCING WITNESSES & EVIDENCE**

The United States does not anticipate offering any evidence in addition to what is contained in the Presentence Report and set forth in this memorandum. Additionally, the United States does not intend to call any witnesses at the sentencing hearing but reserves the right to call CMPD Forensic Examiner Roy Patterson.

**SUPERVISED RELEASE**

Broadway's conviction carries a statutory period of supervised release of at least five years and up to life. PSR ¶ 75. The United States recommends that the Court impose a life-time period of supervised release in this case, which is expressly recommended by the applicable guidelines provisions. *See* USSG § 5D1.2(b).

**CONCLUSION**

WHEREFORE, based upon the foregoing, and such other reasons as may be advanced at the hearing of this matter, the United States respectfully recommends that a sentence of incarceration of 78 months years months followed by a lifetime term of supervised release, is sufficient, but not greater than necessary, to comply with the purposes and considerations set forth in 18 U.S.C. § 3553(a).

Respectfully submitted January 20, 2026.

**RUSS FERGUSON**
**UNITED STATES ATTORNEY**

 *s/ Daniel Cervantes*
Daniel Cervantes
Assistant United States Attorney
FL Bar Number 40836
United States Attorney's Office
Western District of North Carolina
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202

20

Telephone: (704) 338-3115
Fax: 704.344.6629
E-mail: daniel.cervantes@usdoj.gov

## <u>CERTIFICATION</u>

Pursuant to the Standing Order of this Court entered June 18, 2024, and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies:

1.      No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2.      Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Certified on January 20, 2026.


*/s/ Daniel Cervantes*
Assistant United States Attorney